UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

UNITED STATES OF AMERICA,      )

                                    )

      Plaintiff,            )         Case No. 1:02CR22 - 3

                                      )

         v.              )         Judge Ann Aldrich

                                      )

MARTIN T. WILLIAMS,          )

                                      )

      Defendant.      )         <u>MEMORANDUM</u>

                                      )         <u>AND ORDER</u>

_____

      A jury convicted Williams on charges related to an alleged health care billing fraud conspiracy, and he moved for a new trial or for acquittal.  Williams advanced two grounds for a new trial.  First, he contended that the prosecution violated *Brady v. Maryland* by failing to provide a letter wherein it assured government witnesses that they would not be investigated or charged and expressed the expectation that they would testify at trial.  Second, he contended that his trial counsel rendered constitutionally ineffective assistance.  Williams also moved for acquittal on the ground that the evidence was insufficient to support verdicts of guilt beyond a reasonable doubt.

      Instead the court held that Williams is entitled to a new trial pursuant to *Blakely v. Washington*, __ U.S. __, 124 S.Ct. 2531 (2004) and *US v. Booker*, __ U.S. __, 125 S.Ct. 738 (2005).  The court also intimated, without deciding, that Williams might be entitled to a new trial due to the alleged *Brady* violation.  The court declined to address Williams's ineffective assistance claim or his challenge to the sufficiency of the evidence.  The prosecution has appealed to the Sixth Circuit.

Williams now moves for this court's definitive ruling on (1) whether the alleged *Brady* violation entitles him to a new trial and (2) whether the evidence was insufficient for a reasonable jury to find him guilty beyond a reasonable doubt.  The court grants the motion.  For the reasons that follow, the court holds that the prosecution did violate *Brady* and that the violation entitles Williams to a new trial.  But the court also holds that if the Circuit determines that Williams is not entitled to a new trial, the evidence presented at his first trial *was* sufficient to support his convictions.

## I.  PROSECUTION'S *Brady* VIOLATION ENTITLES WILLIAMS TO A NEW TRIAL

While Williams is entitled to a new trial under *Booker* and *Blakely*, this court now holds that he is also entitled to a new trial on another ground as well.  Namely, the prosecution failed to turn over  a letter which could readily be construed as a promise of nonprosecution in exchange for the testimony of two key government witnesses.

Under subpoena, billing clerks Telly Peters, Diane Zemanek (nee Amato) and Debra Alford (nee Thayer)  testified as prosecution witnesses at Williams's trial.  The government has not charged Peters or Zemanek, nor is there any *formal* plea or nonprosecution agreement on record as to either of them.  But under the circumstances of this case, the nondisclosure of an *informal* nonprosecution promise warrants a new trial – a trial at which Williams can present that letter to the jury and use it to aggressively attack those witnesses' credibility.  As Williams contends:

> Each of the three billing clerks gave sworn testimony of their own illegal conduct in furtherance of the charges of which Mr. Williams was accused however, none were prosecuted. In fact, two of the billing clerks, Telly Peters and Diane Amato Zemanek, were given immunity from prosecution. While there was overwhelming evidence of their guilt, they were not prosecuted per their secret agreement with the U.S. Attorney's office.

2

> [T]he pact between the government and the two accusers was not revealed.  By withholding the agreement between themselves and the accusers (via the accusers' attorney, Roger Stark), the government stands in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  This violation dictates [that] a new trial be granted.

The prosecution sent a letter to Peters and Zemanek in May 2003 that may evince an undisclosed, unwritten agreement not to prosecute them.  "Absent knowledge of this immunity pact," Williams contends, "trial counsel was without a strong cross examination issue with which the two accusers' credibility could have been impeached."  Williams's Mot. for New Trial at 2 (citations omitted).

> The prosecution letter in question reads, in full,

> This letter confirms our previous telephone conversation regarding the status of your clients Telly Peters and Diane Zemanek in connection with the government's case, *United States v. Dr. Lal P. Rohira et al.*, Case No. 1:02CR22 [N.D. Ohio].  As we discussed, neither Ms. Peters nor Ms. Zemanek are considered targets or potential defendants in this case.  The government considers both individuals simply to be material fact witnesses and has subpoenaed each of them to testify at trial as prosecution witnesses.  I expect both of them to testify about the same facts they already shared with the FBI.

> I trust this satisfies your clients' concerns.  Should you or your clients have any questions, please call me at ... or [another Assistant U.S. Attorney] at ....

Opp'n to Williams's Mot. for New Trial, Ex. A.  The prosecution strenuously denies that the letter constitutes or reflects a nonprosecution pact with Peters and Zemanek, and it maintains that disclosure of the letter could not have changed the result of the trials anyway.

But the issue is not the prosecution now claims it subjectively intended the letter as a nonprosecution pact.  Nor is the issue whether this court might view the letter as evidence of such a pact.  Rather, the issue is whether a reasonable jury could view the letter as such.  More to the point, could a reasonable jury *aware of the letter's existence* receive Peters and Zemanek's testimony with greater skepticism, even incredulity?  The court finds that a reasonable jury could take such a view, possibly to the

great detriment of the prosecution's case.  This is particularly plausible given that the prosecutor closed the letter with language of reassurance, "I trust this satisfies your clients' concerns," which sounds like a promise.

The Supreme Court holds that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *See also Miskel v. Karnes*, 397 F.3d 446 (6th Cir. 2005) (*Brady* was "an access-to-evidence case" that establishes defendant's right to receive and use evidence that is material to guilt or innocence) (citation omitted).  "[I]t is well-settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness," such as the Peters-Zemanek letter.  *See US v. Edmonds*, 106 Fed. Appx. 416, 421, 2004 WL 1791478, at *4 (6th Cir. Aug. 6) (citing *Giglio v. US*, 405 U.S. 150, 154-55 (1972)), *cert. denied*, __ U.S. __, 125 S.Ct. 679 (2004).

Even so, the prosecution could have cured the violation by offering to turn over the letter at trial, because *Brady* applies to completely withheld evidence rather than belatedly disclosed evidence.  *See US v. Dobbins*, 111 Fed. Appx. 832, 836-37, 2004 WL 2299091, at *3 (6th Cir. Oct. 13, 2004) (citing *US v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994)), *reh'g en banc den.* (6th Cir.), *cert. denied sub nom. Wells v. US*, __ U.S. __, 125 S.Ct. 2315 (2005).  Here, however, the prosecution *never* offered to turn over the letter, and the court cannot be sure that defense counsel could have obtained it on their own.  *Cf. US v. Edgecombe*, 107 Fed. Appx. 532, 541, 2004 WL 1858855, at *4 (6th Cir. Aug. 17,2004) (citation omitted) ("The government does not suppress evidence in violation of *Brady* by failing to disclose evidence

to which the defendant had access through other channels."). Instead, defense counsel were left to proceed at a significant handicap without the letter.

A new trial may be granted on the ground of a *Brady* violation if "the undisclosed evidence undermines confidence in the outcome of the trial." *US v. Winston*, 2003 WL 173046, at *6, 55 Fed. Appx. 289, 296 (6th Cir. Jan. 23) (quoting *Kyles v. Whitley*, 514 U.S. 419 (1995)), *cert. denied*, 538 U.S. 1066 (2003).  That standard is met here.

A reasonable jury could readily find the letter to be evidence of an otherwise undisclosed nonprosecution agreement.  In fact, it would be more surprising if a jury took the opposite view.  Thus, if defense counsel had received the letter before trial, he could have used it on cross examination to challenge the credibility of Peters and Zemanek's testimony.

Specifically, a reasonable juror could reason that:  (1) the evidence suggests that Peters and Zemanek themselves might have engaged in illegal activity; (2) as evinced by the charges against Rohira and Williams, such illegal activity could subject Peters and Zemanek to lengthy prison sentences; (3) nonetheless, Peters and Zemanek have not even been investigated, let alone charged, and the prosecutor's letter assures them that they will not be; (4) the prosecution's letter at least implied a *quid pro quo* by emphasizing the expectation that Peters and Zemanek would testify to the matters they had discussed with the FBI; (5) Peters and Zemanek gave testimony that damned Williams and Rohira and made it difficult for them to sow reasonable doubt in the jurors' minds.

Therefore, the jury could conclude, Peters and Zemanek had a powerful incentive to give false, exaggerated or misleading testimony against Williams to stay in the good graces of the prosecution.  *See US v. Christian*, 786 F.2d 203, 214 (6th Cir. 1986) (plea "may properly be considered as evidence of

a witness' credibility"); *US v. Townsend*, 796 F.2d 158, 163 (6th Cir. 1986) (introducing witness's plea allows jury to "consider fully the possibly conflicting motivations underlying the witness' testimony, and, thus, the witness' credibility").

The prosecution's failure to turn over the letter denied defense counsel what was probably the best method of undermining the jury's trust in Peters and Zemanek. *See Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005) (evidence of prosecution's "deal [with a government witness] would have provided *powerful and unique* impeachment evidence demonstrating that [the witness] had an interest in fabricating his testimony.") (emphasis added). It is true that even without knowing about the letter, the jury might have *speculated* that Peters and Zemanek gave their testimony to avoid being prosecuted. Absent the letter, however, the jury would have nothing it could reasonably take as inferential *proof* of such an agreement. For its part, the prosecution would not violate *Brady* merely by failing to tell defense counsel or the jury that it had decided not to prosecute Peters and Zemanek:

> The government is free to reward witnesses for their cooperation with favorable treatment in pending criminal cases without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony.... [T]he fact that a prosecutor afforded a witness favorable treatment, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony.

*Wisehart v. Davis*, 408 F.3d 321, 325 (emphasis in original) (quoting *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003)), *reh'g en banc denied* (7th Cir. June 24, 2005).

But once the prosecution sent the letter to Peters and Zemanek, it created arguable hard evidence of such a promise. If the jury knew about the letter, the prosecution could try to explain it away, but it could not deny the letter's existence. *Contrast US v. Lopez*, 372 F.3d 1207, 1210-11 (10th Cir. 2004) (although government witnesses testified that they had been threatened with arrest if they did not testify,

6

there was no written record of the alleged threats; therefore it was not clear error to find that government did not promise leniency in exchange for testimony where the investigating officers categorically denied making such threats or promises).  The prosecution could not sidestep its *Brady* obligation merely because the letter did not say in so many words, "If you testify for the government, you will not be prosecuted."  *See Wisehart*, 336 F.3d at 334 ("*Express or tacit*, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense.") (emphasis added).  The jury could view the letter as *proof*, not mere speculation, that Zemanek and Peters had reached an understanding with the prosecution.  That is precisely the type of evidence covered by *Brady*.

The loss of the opportunity to impeach Peters and Zemanek with the letter likely substantially influenced the outcome of the trial.  Within Rohira's practice, Peters and Zemanek played a major role in billing, and arguably in perpetuating improper billing practices.  As a result, they were not minor witnesses. Their testimony played a large, probably critical role in helping to convict Williams.  *See Reutter v. Solem*, 888 F.2d 578, 581 (8th Cir. 1989) (prosecution failed to disclose that parole hearing had been postponed pending testimony of witness on whom the State's case "depended almost entirely").[1]  If the jurors discounted Peters and Zemanek's testimony, they would have viewed the case in a very different light. Without their testimony, the rest of the evidence would not seem so formidable when stacked up against Williams's explanations.

_____

[1]    *Contrast Clay v. Bowersox*, 367 F.3d 993, 1000-1001 (8th Cir. 2004) (information about plea offered to witness was not material under *Brady*, because the most damaging evidence came from other witnesses), *cert. denied*, 125 S.Ct. 2246 (2005).

Failure to disclose "evidence that could reasonably be viewed as casting the entire case in a different light could hardly be viewed as harmless error." *Spirko v. Mitchell*, 368 F.3d 603, 609 (6th Cir. 2004) (citing *Kyles*, 514 U.S. at 436-37), *cert. denied*, 125 S.Ct. 1699 (2005). The prosecution would find it far more difficult, perhaps impossible, to marshal the remaining evidence to show guilt beyond a reasonable doubt. Putting aside Peters and Zemanek's testimony, the court cannot find that the remaining evidence was so overwhelming that Williams still would have been convicted.

Therefore, this court finds "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," i.e., the jury would have acquitted Williams. *See US v. Stewart*, 5 Fed. Appx. 402, 408, 2001 WL 223898, at *5 (6th Cir. Feb. 27, 2001) (defining when evidence is "material" for *Brady*) (quoting *Kyles*, 514 U.S. at 433-34).

## II.  WILLIAMS'S MOTION FOR JUDGMENT OF ACQUITTAL: THE EVIDENCE WAS SUFFICIENT TO SUPPORT HIS CONVICTIONS

### A.  Legal Standard

When assessing the sufficiency of evidence, the court's review is narrow. The inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *US v. Ford*, 2003 WL 21801426, at *4 (6th Cir. Aug. 1) (emphasis in original) (citing *Jackson v. VA*, 443 U.S. 307, 319 (1979)), *cert. denied*, 540 U.S. 1066 (2003). "Rational" means based on "logic and reason as opposed to passion or prejudice." *US v. GE*, 869 F. Supp. 1285, 1289 n.4 (S.D. Ohio 1994).

The court may reverse a conviction for insufficient evidence only if it is not supported by "substantial and competent evidence upon the record as a whole...." *US v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).

8

The granting of a motion for acquittal "should be confined to those cases where the government's failure is clear." *US v. Mikell*, 84 Fed. Appx. 485, 488, 2003 WL 22976438, at *3 (6th Cir. Dec. 1, 2003) (court erred by granting acquittal) (citing *US v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989)), *cert. denied*, 124 S.Ct. 2185, __ U.S. __ (2004).

Reasonable inferences must be permitted from basic facts to ultimate facts, and there need not be direct evidence supporting every element of the crimes charged. *See US v. Townsend*, 796 F.2d 158, 161 (6th Cir. 1986). Indeed, "[C]ircumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need not sustain every reasonable hypothesis except that of guilt." *Ford*, 2003 WL 21801426 at *4 (citing *Stone*, 784 F.2d at 362). In reviewing a challenge to the sufficiency of the evidence, the court accords the same weight to direct and circumstantial evidence. *See US v. Prince*, 214 F.3d 740, 746 (6th Cir.), *cert. denied*, 531 U.S. 974 (2000).

**B.      Discussion**

   1.      Testimony on Williams's Skills, Experience and Job Duties
           Does Not Undermine Validity of Guilty Verdicts

Williams's acquittal motion emphasizes that he lacked "business acumen, accounting background, economic savvy, or basic computer literacy." This continues the strategy of Williams's trial counsel, who said in his opening statement, "he took the position of clinical manager. Not business manager, not accountant, not economist, not bookkeeper. * * * Marty was not brought in with any training whatsoever in accounting or economics or bookkeeping, and he didn't have that job for Lal Rohira. His title again was clinical manager." Tr. of Mon. Dec. 8, 2003 ("Day 1") at 2:24 to 3:1 and 4:21-24; *see also* Tr. of Wed.

Dec. 10, 2003 ("Day 3") at 9:9-15 (Williams direct).  While not bearing directly on the charges against

Williams, it was understandable and not inappropriate for trial counsel to take this approach.  It was

apparently intended to encourage the inference that Williams lacked the skills and knowledge needed to

commit fraud through technical miscoding or mischaracterization of services.  Trial counsel further argued:

> The evidence you are going to hear during the course of the next few days is, and I would invite the Government to provide us with this if they have it, any signed checks signed by Marty Williams, any prescriptions that were filled out or signed by Marty Williams, any billing forms that were signed out or composed by Marty Williams.  Whether there was any mailing of billing forms or wiring of billing forms by Marty Williams, whether he used the computers at any time, whether he sent an electronic claim or paid any office bills, whether he saw the office books or oversaw them or helped to compose them, whether he ever instructed anyone on billing codes, whether he told anyone to bill for no shows.
>
> * * *
>
> [A]nd as I said, they don't have a single check with his name on it, they don't have any proof whatsoever that Marty Williams did any of the billing, nor did he instruct anyone to bill.

Tr. Day 1 at 5:16 to 6:6 and 8:4-8.   On cross-examination, Zemanek stated that she could not recall

Williams writing or signing any checks on behalf of Rohira's practice.  *See* Tr. Day 3 at 238:3-7.

Counsel encouraged the inference that Williams could not have conspired to commit such fraud

because his job did not entail keeping the books, assigning billing codes, or preparing reimbursement

claims.  In light of the evidence against Williams, however, the jury was merely allowed, not required, to

make such an inference.  This is especially true given the billing clerks' testimony that Williams was not

merely a clinician but the business manager of all three offices:

> Q.     How do you know the defendant?
> A.     I worked, actually, for him.  He was the business manager while I worked in Sandusky.
>
> Q.     All right.  What were his - what were the scope of his duties?
> A.     *He was to oversee all the business operations of the Sandusky office*.  We were to pretty much, if we had any problems or anything that went on during, you know, the billing, we were to contact Marty Williams.

10

> Q.    *What about Vermilion and Lorain?  Was he the business manager of those offices as well?*
> A.    *Yes, he was.*
>
> Q.    Okay, and did those duties include billing practices, billing to insurance companies?
> A.    Yes.
>
>           * * *
>
> Q.    He was the business manager at this point?
> A.    Yes, he was.  All the questions that were – we had to take all the questions, anything that had to do with the business end of the office had to be addressed through Marty Williams. We were no longer pretty much able to bother doc with the problems.
>
> Q.    So the office policy was you go to Marty if you have a billing issue?
> A.    Yes.

Tr. Dec. 9, 2003 ("Day Two") at 4:25 to 5:14 and 13:22 to 14:5 (emphasis added); *see also id.* at 33:1-2.[2] Former Rohira billing specialist and clerk Debra Alford also testified that she considered Williams to be Rohira's business manager.  In support of this impression, Alford recalled Williams directing an employee to compile a billing code book for the staff.  *See* Tr. Day 3 at 96:6 to 97:1.

 Williams's acquittal motion also emphasizes that Rohira's offices employed illegal billing practices for years before Williams arrived.  Consistent with that claim, Zemanek testified that she participated in upcoding (billing "med checks" as more lucrative psychotherapy sessions) before Williams joined the practice.  *See* Tr. Day 3 at 246:9 to 247:16 (cross).  But that does not compel the conclusion that Williams did not conspire to continue those practices.  The government did not need to prove that Williams was one of the founders of the conspiracy or that he entered it early on, only that he became a member of the conspiracy at some point during his employment with Rohira.

---

[2]  Indeed, in his opening statement, Williams's own counsel inadvertently referred to him as Rohira's "business manager."  *See* Tr. Day 1 at 5:11-13.

2.     Testimony that Rohira Upgraded Williams from an Independent Contractor or Hourly
       Employee to a Salaried Employee When He Named Him Business Manager

Next, Williams notes that his salary as Rohira's clinical manager was no higher than his former

salary as a clinician.  Williams's acquittal motion does not cite the transcript to show where his counsel

placed that alleged fact before the jury.  Nor does he explain what significance the jury should have

attached to this fact.  Perhaps Williams is implying that if he had helped perpetuate illegal billing practices,

Rohira would have rewarded him with a higher salary; conversely, the absence of a higher salary suggests

that Williams was not complicit in those practices.  While that inference would be reasonable, it is not

ineluctable.  On the contrary, billing clerk Telly Peters testified that when Rohira made Williams business

manager in addition to his clinical duties, Williams went from being an hourly employee or independent

contractor to a salaried employee with benefits.  *See* Tr. Day Two at 34:8-15.  Zemanek testified to the

same effect:

> Q.     ... [D]id Marty become the business manager?
> A.     Yes.
>
> Q.     Did his compensation change at that time, do you know?
> A.     Yes.
>
> Q.     How did it change?
> A.     He went from getting a check as a subcontractor, which the dollar amount fluctuated from
>        paycheck to paycheck, varying on the amount of insurance money we had taken in, to a
>        salaried position.
>
> Q.     So he went from taking a percentage of the fees he generated from therapy to --
> A.     Salary.
>
> Q.     To salary plus?
> A.     Um-hmm.

12

Tr. Day Three at 224:6-20.  Williams's testimony on this issue was more vague, but he did acknowledge

that his duties changed when Rohira elevated him to salaried status:

> Q.       Now, when you went on salary with Dr. Rohira, did your duties change?
> A.       My duties changed as far as everything was a mess, and the billing people were feuding
>          and nobody could make heads or tails out of anything....  * * *  If you know what's the
>          problem with it, you have to fix it.  * * *

Tr. of Dec. 10, 2003 at 19:13-23.

The jury was free to attribute no inculpatory significance to the fact that Williams' elevation to

salaried status was contemporaneous with his selection as business manager.  Perhaps Rohira upgraded

Williams's compensation because Williams's handling of employees' billing questions freed Rohira to see

more patients.  The jury could reasonably conclude, however, that Williams's improved status constituted

a *quid pro quo*.  Rohira could have upgraded Williams's compensation in return for help in carrying out

fraudulent billing practices and deflecting employees' questions.

> 3.       Convictions Not Undermined by Fact that Williams Did Not Establish
>          and Could Not Ultimately Dictate Fraudulent Billing Practices

Williams points out that he "had no authority to hire or fire, to submit bills, to set office policy, or

to effect [sic] the business practices of any of the three offices."  If true, it is understandable why Williams

would draw the jury's attention to this fact.  A lack of such authority is consistent with a portrait of Williams

as a mere employee who could not control billing practices and never knowingly participated in illegal billing

practices that were set at the top by Rohira.  Unfortunately for Williams, the fact that he did not *establish*

or control office policies does not rule out the possibility that he conspired to carry out the policies, knowing

they were illegal.

For example, in *US v. M/G Transport Servs.*, 173 F.3d 584 (6th Cir. 1999), the government laid charges including conspiracy to violate the Clean Water Act against the captains of boats that dumped pollutants into the Ohio River without a permit.  The jury convicted, but the district court granted the captains' motion for acquittal.  The court found the evidence at trial supported the inference that the captains knew pollutants were dumped from their vessels on some occasions.  The court held, however, that "the evidence was insufficient to establish the captains' ability to alter company policy regarding the non-permitted discharge...."  *Id.* at 590.  The Circuit reversed on that score and reinstated the captains' convictions, stating "while it is true that the captains neither developed policy for M/G Transport concerning disposal of wastes nor personally dumped the residue of the burn barrels into the rivers, the jury could reasonably infer that those defendants knew that illegal dumping of pollutants was occurring" and went along anyway.  *Id.*

In this vein, the government did not need to prove that Williams was integral to the fraudulent billing conspiracy or was closely connected with the conspiracy (though there was testimony tending to show that he was).  *See US v. Price*, 63 Fed. Appx. 843, 486, 2003 WL 1984699, at *2 (6th Cir. Apr. 25, 2003) (defendant's connection "to the conspiracy need only be slight if there is sufficient evidence to establish the connection beyond a reasonable doubt") (citing *US v. Ward*, 190 F.3d 483, 488 (6th Cir. 1989) (citation omitted)).


4.      <u>Government Did Not Need to Prove that Williams Played More Active or More
        Important Role in Conspiracy than Clerks, Nor is Possible Guilt of Clerks Relevant</u>

14

Even assuming *arguendo* that the three clerks played a more active or important role in the conspiracy than Williams, that does not impugn the jury's finding that Williams was guilty of conspiracy. For instance, in *US v. Nichols*, 151 F.3d 850 (8th Cir. 1998), the defendant appealed her conviction for conspiracy to rob a bank. The district court there had admitted a redacted version of an audiotape wherein the defendant and others discussed the contemplated robbery. The defendant complained that the redacted version took "her isolated comments out of context" and gave the misleading impression that she "dominated the conversation." The Eighth Circuit rejected the defendant's argument, stating, "it is of no consequence to Nichols' involvement in the conspiracy that someone else may have had more to say about the robbery during the conversation than she did .... Any differences in the co-conspirators' relative participation in the planning do not diminish Nichols' active and willing collaboration in the conspiracy." *Id.* at 853.

Nor would it matter if Rohira's billing clerks alone were responsible for the preparation and submission of fraudulent bills and Williams did not know anything about the "nuts and bolts" of that process. "Every member of the conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement." *US v. Slone*, 43 Fed. Appx. 738, 742, 2002 WL 486389, at *4 (6th Cir. Mar. 29, 2002) (quoting *US v. Le*e, 991 F.2d 343, 347-48 (6th Cir. 1993) (citations omitted)); *see also US v. Weiner*, 755 F. Supp. 748, 754 (E.D. Mich. 1991) ("While it is necessary to prove that the co-conspirators agreed on the central objective of the conspiracy, the agreement may consist of nothing more than a passive understanding") (citation omitted), *aff'd*, 988 F.2d 629 (6th Cir. 1993). *See, e.g., US v. Crossley*, 224 F.3d 847, 857 (6th Cir. 2000) (evidence sufficient to sustain conviction for conspiracy to commit mail fraud by cashing fraudulently obtained check,

notwithstanding that person who enlisted defendant's help did not tell him details of scam, because defendant knew an illegal scam was involved and agreed to participate).

Another theme that pervades Williams's trial defense and acquittal motion is that Peters, Zemanek, and Alford were responsible for any illegal billing practices. He charges, "Each of the three billing clerks gave sworn testimony of their own illegal conduct in furtherance of the charges of which Mr. Williams was accused." While Williams is exasperated that the clerks have never been charged, it does not avail him to focus on their supposed guilt, instead of the evidence against him. Even assuming *arguendo* that all three clerks could be convicted of the same charges, that has no bearing on whether the evidence supports *his* convictions. As the First Circuit aptly explains,

> The mere fact that the evidence in a case, viewed from the defendant's coign of vantage [sic], points convincingly to another person ... does not prevent a conviction. After all, it is for the jury to mull the evidence, assess the credibility of the witnesses, and draw such reasonable inferences as it may choose. Once the jury performs that task and authors a verdict, judicial review thereafter must concentrate on whether the jury's interpretation is sustainable under the governing legal standards. *Whether the jury plausibly could have pointed the finger of blame at someone else is not the question.*

*US v. Noah*, 130 F.3d 490, 495 (1st Cir. 1997) (internal citation omitted) (emphasis added);[3] *see also* *US v. Stewart*, 306 F.3d 295, 307 (6th Cir. 2002) ("It is irrelevant that [defendant] characterizes [codefendant] as the 'principal' in the offense."); *US v. Argo*, 23 Fed. Appx. 302, 307, 2001 WL

---

[3]     *See, e.g., US v. Humphrey*, 279 F.3d 372, 378-79 (6th Cir. 2002) (Circuit rejected argument that embezzlement loss could have been caused by someone else, noting the argument "fail[ed] to rebut the substantial amount of circumstantial evidence that supports the jury's guilty verdict"). *Cf. US v. Sims*, 46 Fed. Appx. 807, 811, 2002 WL 31012124, at *2 (6th Cir. Sept. 6, 2002) ("all participants in conduct violating a federal criminal statute ... are punishable for their criminal conduct. The fate of other participants is irrelevant.") (quoting *Standefer v. US*, 447 U.S. 10, 20 (1980)).

16

1216966, at *3 (6th Cir. Oct. 4, 2001) (affirming denial of acquittal "The fact that the evidence presented at trial might have strongly implicated [a cooperating witness] does not render such evidence exculpatory regarding [defendant]").[4]

In short, Williams's belief that the government should have charged the clerks instead of him, has no bearing on the sufficiency of the evidence to prove *his* guilt beyond a reasonable doubt.  *Cf. US v. Hoffa*, 205 F. Supp. 710, 717 (S.D. Fla.1962) (even if others were equally guilty but had not been prosecuted, defendants were not entitled to have indictment dismissed).

5.    Testimony That, If Believed, Tended to Exculpate Williams

Both Williams's own testimony and his counsel's cross-examination of the prosecution's witnesses endeavored to persuade the jury that:  Rohira's illegal billing practices pre-dated Williams's arrival; Williams was a clinician or clinical manager, not the business manager; he tried to ferret out and correct any inappropriate billing practices; there was a legitimate "gray area" as to whether Szyrej qualified to be "grandfathered" in as a psychotherapist without fulfilling the current requirements for a license; Williams required the psychotherapists and other staff to provide him with documentation proving they were licensed;

---

[4]    In *US v. Lewis*, 92 Fed. Appx. 354, 2004 WL 549800 (7th Cir. Mar. 16, 2004), the defendant was convicted of possessing a gun found in the car in which he was a passenger. He contended that the court should have admitted evidence that the driver had a motive for possessing the gun.  The Circuit held that such evidence "would not make the relevant fact of consequence - [defendant]'s possession of the gun - any less probable...."  *Id.* at *2.  In a case like *Lewis*, only one person could have possessed the gun.  Here, by contrast, the clerks' guilt of conspiracy and Williams's guilt are not mutually exclusive.  *Cf. US v. Ortland*, 109 F.3d 539, 545 (9th Cir. 1997) (evidence that codefendant fled "does not tend to show that someone else [defendant] is innocent, at least ... where there can easily be more than one guilty person").

17

he instigated an audit of the billing practices by an independent CPA firm; and he wanted the staff to create more detailed documentation as to the date and time of patient sessions. *See, e.g.,* Tr. Day 3 at 23:2 to 25:23 and 53:21-25 (when Williams learned Szyrej was unlicensed, he told her she could conduct only a final session with each patient to gain "closure" and that she could not bill for those sessions); *id.* at 25:24 to 28:10 and 36:4 to 37:17 (around summer 1997, Williams recommended to Rohira and the staff that they keep more detailed, accurate patient charts and treatment plans, and most staff improved in response to his urgings); *id.* at 28:11 to 29:10 (Williams warned Rohira that staff was illegally billing insurance companies for "no shows" and told staff they could not do so).

Other than Williams's own testimony, there was some other testimony that the jury could have used to acquit. For example, Zemanek agreed that Williams did not prepare or send out bills. *See* Tr. Day 3 at 251:17 to 252:2 (cross). Zemanek also agreed that an independent audit of the practice had been ordered by Williams and Rohira, or perhaps by Williams alone. *See id.* at 248:2 to 249:8, corroborating Tr. Day 3 at 33:13 to 34:1 (Williams direct).

Moreover, Zemanek testified that when she brought her concerns about Szyrej's lack of a license to Williams, "he talked to Sharonne Szyrej. ... and he told her that she could no longer see patients." Tr. Day 3 at 224:21 to 225:3. *But see id.* at 227:7-10 (at meeting, Williams did not tell staff to stop billing for Szyrej's unlicensed services); *id.* at 241:12-15 (Williams did not tell Zemanek to stop billing for Szyrej's services, Zemanek decided on her own to stop doing so).

     6.    <ins>Prosecution Presented Ample Evidence of Williams's Guilt,<br>and Jury Was Entitled to Disbelieve His Contrary Testimony</ins>

The jury, however, was entitled to disbelieve Williams's testimony in light of the substantial evidence against him. *See US v. Clark*, 56 Fed. Appx. 217, 219, 2003 WL 152315, at *2 (6th Cir. Jan. 21, 2003); *see, e.g., US v. Bartos*, 51 Fed. Appx. 957, 968, 2002 WL 31684754, at *9 (6th Cir. Nov. 22, 2002) (in child porn prosecution, jury was entitled to disbelieve defendant's claim that he intended to receive only material involving adults); *Hammond v. Withrow*, 16 F.3d 1219, 1994 WL 49546, at *5 (6th Cir. Feb. 17) (jury entitled to disbelieve defendant's claim that he did not intend to kill victim, in light of testimony that he removed victim to a remote area and his own testimony that he struck victim in head with a pipe), *cert. denied*, 513 U.S. 816 (1994).

Williams himself admitted that he knew that the practice was engaged in fraudulent billing practices, including upcoding "med checks" as psychotherapy sessions. *See* Tr. of Dec. 10, 2003 at 31:20 to 32:7 (direct) and 49:14-25 (cross).  At trial, Williams confirmed that he told an FBI agent that he knew the practice was engaged in illegal billing but continued working there anyway:

> Q.    If Agent Graupmann wrote down in a report that you told him that Telly Peters quit because of that up-coding, was Agent Graupmann wrong?
>
> * * *
>
> Q.    In fact, did you tell the FBI that day that you knew that was wrong, too, but that you had a wife and three kids and needed a job?
>
> A.    Yes.  He asked me if in fact I agreed with what was going on, and I said no, they were wrong.

*Id.* at 51:21 to 52:10 (cross).

For its part, the prosecution presented ample testimony that Williams not only knew about those practices but intentionally promoted and directed them in concert with Rohira.  Peters testified that she was

19

present at a meeting where Rohira and Williams instructed the staff to use fraudulent billing practices such

as "upcoding" and overstating the length of patient sessions:

> Q.    Are you familiar with a service called a med check?
> A.    Yes, I am.

> Q.    And what is that?
> A.    It's usually a half hour visit where the patient if they need an adjustment for medication they come in and see Dr. Rohira.  They usually were brought in the office on a 15 minute interval, but they were billed for half hour visits.
> * * *
> Q.    And are you familiar with how the office billed or if the office billed for those med checks to insurance companies, and if so, how?
> A.    They were billed as half hour to hour visits.  They had ... a certain code that they were billed for that.
> * * *
> Q.    ... Would Dr. Rohira make more money if he bills a med check as a med check or if he bills a med check as therapy?
> A.    As therapy. ...
> * * *
> Q.    Miss Peters, you were telling us about some instructions you received regarding the billing of med checks as therapy.  Who told you?
> * * *
> A.    [Psychotherapist Sharonne Szyrej] explained to me that the med checks were, there were only three certain codes that we used, and the med checks were the ones that we received the highest amount of money for, so we were to bill all of Dr. Rohira's patients as that.
> * * *
> Q.    Did you say that Dr. Rohira gave you instructions in that regard?

> A.    When I had gone to the Sandusky office,....  At that time *there was a meeting with Dr. Rohira and Martin Williams as he became the, more into the business management part, and we discussed some of the codes and how they were going to be paid, what paid the most, and that's the codes we used.*

Tr. Day 2 at 6:19-25 and 7:14-20 and 8:5-8 and 10:7 to 11:5 (emphasis added).  Likewise, Alford

testified that staff were instructed to dishonestly bill insurance companies for a thirty-minute therapy session

when they knew the service rendered was a fifteen-minute "med check," which merited a lower payment.

20

*See* Tr. Day 3 at 109:15 to 112:4.  Significantly, Peters, Alford and Zemanek all testified that they met with Williams and raised their concerns about these billing practices.  *See* Tr. Day 2 at 37:14 to 40:6; Tr. Day 3 at 148:2 to 149:20; *id.* at 232:25 to 233:18.

In addition, Peters testified that Williams instructed her to bill insurance companies for psychotherapist Sharonne Szyrej's work as if Dr. Rohira had done the work:

> Q.     Do you know whether her time with patients was billed to insurance companies?
> A.     Yes, it was.
>
> Q.     How was it billed?  What was it billed as?
> A.     As an hour psychotherapy visit.
>
> Q.     And was there anything on the bill to indicate to the insurance company who provided the service to the patient?
> A.     No.  It was billed as if Dr. Rohira had seen the patient.
>                           * * *
> Q.     Who instructed you to do that?
> A.     It would be Dr. Rohira, and then later it would be Marty Williams.
>
> Q.     Later it would be – later, after he took over as the business manager?
> A.     Yes.

Tr. Day 2 at 11:7-22 and 12:10-15.  Similarly, Alford testified that both before and after Williams became business manager, the practice routinely billed Medicaid/Medicare and insurance companies for Szyrej's psychotherapy sessions as if they had been conducted by Rohira.  *See* Tr. Day 3 at 112:17 to 113:1, 114:2-12 and 122:21 to 126:10.  Alford explained that the practice received payment at a higher rate for services billed as Rohira than for services billed as done by a psychologist or social worker.  *See id.* at 145:24 to 147:6.

Rohira's billing clerk Telly Peters further testified that Williams knew Szyrej was unlicensed but did nothing to stop her from seeing patients or to prevent the staff from billing insurance companies for her

21

services.  *See* Tr. Day 2 at 14:7 to 18:19.  In addition, Peters testified that Williams did nothing when

informed that the practice was billing insurance companies at Rohira's rate for an impossibly large number

of patients at hospitals and nursing homes:  "it would be humanly impossible for him to see that many

patients in one day."  *See* Tr. Day 2 at 27:10 to 29:25.  Instead, Peters claimed, Williams "told us to let

it go through" and "[w]ait to see if some of them get kicked back for denial."  *Id.* at 30:1-8.  Alford

confirmed that from the early 1990s on, "[i]t was common knowledge that Sharonne did not have a license"

to practice psychotherapy in Ohio, but that nonetheless Szyrej was allowed to see patients in that capacity

while Williams was business manager.  *See* Tr. Day 3 at 115:11 to 116:6; *id.* at 127:11 to 129:18 and

151:9-24.

      The jury also heard testimony suggesting that Williams knew the offices' billing practices were illegal

and directed others to alter documents in anticipation of an audit.  Alford testified:

> Q.     At some point did Diane Amato [Zemanek] go to a Medicare-sponsored seminar?
> A.     Yes she did.
>
> Q.     Was it called "Could You Withstand An Audit?"
> A.     Yes, it was.
>
> Q.     Did these discussions in the office that you have been describing happen after that?
> A.     Yes, the information was given by Mr. Williams.
>
> Q.     What information?
> A.     He was relaying the information from these meetings to us.
>
> Q.     What did he relate?
> A.     Talking about that we have to watch our documentation, if it is not in writing it doesn't
> exist, *he would use the CYA [Cover Your A–] acronym,*[5] *whatever it is, a lot.*

---

[5]     The jury was free to conclude that despite Williams's CYA comment, he sincerely
intended the audit to uncover improper billing practices so they could be corrected.  *Cf.*

* * *

A.  ... [H]e did say several times that it is – if we get audited, it is written, so *he was trying to change some of this stuff so we could say if the auditors came in that we saw the error of our ways and were making our corrections.*  He admitted he had been through audits before, or an audit before.

Q.  Is there any context for the statement "it's not if we'll be audited, but when"?  How did that come up?

A.  Well, by discussing what he found out from these meetings, or from what Diane told him. *And as business manager, this is what he was telling us what we needed to do.*

* * *

Q.  [D]id he agree or disagree that that kind of billing was proper?

A.  Well, he had some suggestions.  He brought up a bell curve, and *a bell curve is something the insurance companies look at, it is shaped like a bell, and if your curve is real high, almost spikes, it shows that you are using certain codes excessively and they will start, that will send off a red flag and they will want to come in and check out why is this one code being used so much, you know, explain yourself, therefore, go over the charts.  So using the bell curve was discussed, and how we needed to level off our coding so it wasn't such a red flag for insurance companies.*

* * *

---

*Borroto v. Campbell*, 2002 WL 655523, at *8 n.5 (N.D. Tex. Apr. 18, 2002) (in action alleging that police used excessive force, comment in police memo on use of force that purpose of memo "is CYA, while crass, does not evidence a disregard for the rights of potential arrestees").

But the jury was also free to conclude that Williams did not really intend to uncover and stop illegal billing.  *Cf. Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 996 (5th Cir. 1996) (in ADEA action, witness testified that memo criticizing employee's productivity "was substantially true but ... was also a CYA (cover your -ss) letter"); *Doke v. PPG Indus.*, 2003 WL 21355926, at * (D. Kan. June 10, 2003) (supervisor said retailer's new policy "wasn't really going to change anything that we were doing in the store and that memo announcing policy was "basically something they were doing to CYA"), *aff'd*, 118 Fed. Appx. 366 (10th Cir. Nov. 24, 2004).

The inference that the audit was *only* a CYA measure was especially reasonable given Peters's testimony that Williams told the staff that if auditors showed up, "[W]e were basically to try and hold them off at the door until we could figure out what they were doing."  Tr. Day 2 at 41:1-20.

23

Q.     Did Defendant Williams instruct Telly Peters as to how to bill in order to avoid this bell curve?

A.     *I believe we were told to manipulate the codes to keep the bell curve in proportion so we wouldn't be red flagged.*  That's the term they use.  Alarm [sic], bells and whistles won't go off.

A.     *You said you were told.  Who told you?*
A.     *Mr. Williams.*

Tr. Day 3 at 149:24 to 151:8, 151:25 to 152:12 and 154:10-17 (italics added).  Williams admitted telling the staff, "It's not if we're audited, it's when."  *Id.* at 63:20 to 64:6 (cross).

Lastly, Peters was shown letters that the practice sent in response to Medicare inquiries about questionable bills.  The letters, which had Williams's name on the bottom, stated that certain patients from the Sandusky office had been erroneously billed "due to numerous computer problems we have been experiencing...."  Peters testified that Williams had written this language and that there had not in fact been any such computer problems at the Sandusky office.  *See* Tr. Day 2 at 43:19 to 46:9; *but see* Tr. of Dec. 10, 2003 at 20:16 to 21:22 (Williams does not recall writing or dictating those letters, and implies that someone used his signature stamp without his permission).

Now, other than prosecutions for perjury, even the uncorroborated testimony of a single witness may be sufficient to sustain a conviction.  *See US v. Hurley*, 105 Fed. Appx. 452, 2004 WL 1563472, at *1 (4th Cir. July 14) (citation omitted), *cert. denied*, __ U.S. __, 125 S.Ct. 119 (2004); *US v. Sumner*, 325 F.3d 884, 890 (7th Cir.) (citations omitted), *cert. denied*, 540 U.S. 897 (2003); *US v. Nadler*, 698 F.2d 995, 1002-1003 (9th Cir. 1983) (citations omitted).  *A fortiori* the consistent testimony of several witnesses, if believed, is sufficient to sustain Williams's convictions.

In short, this was far from an open-and-shut case.  The jury reasonably could have believed Williams's version of events over the prosecution's competing version.  When considering a Rule 29

24

motion, however, the court "may neither weigh conflicting evidence nor consider the credibility of witnesses. To [do] otherwise would be to allow the trial judge to invade the province of the jury as the sole finder of fact in a jury trial." *US v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984); *accord US v. Cortez Martin*, 2004 WL 1462396, at *1, 103 Fed. Appx. 582 (6th Cir. June 21, 2004), *cert. denied*, 125 S.Ct. 1688 (2005). The court does not "ask itself whether *it* believes the evidence at the trial established guilt beyond a reasonable doubt...." *US v. Lee*, 359 F.3d 412, 415 (6th Cir. 2004) (citation omitted) (emphasis in original). Because the jury's guilty verdicts are supported by substantial and competent evidence, they may not be disturbed.

## III. ORDER

Williams's motion for reconsideration and for further disposition [doc. no. 179] is granted.

In addition to and independent of the *Blakely / Booker* grounds articulated in this court's earlier opinion and order, Williams is entitled to a new trial under *Brady v. Maryland* due to the prosecution's failure to give his counsel letters wherein the prosecution assured government witnesses Peters and Zemanek that they would not be investigated and prosecuted.

Williams is *not* entitled to acquittal due to insufficient evidence, because the evidence presented at trial was sufficient for a reasonable jury to find him guilty beyond a reasonable doubt.

IT IS SO ORDERED

       /s/ Ann Aldrich
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

Dated:  August 9, 2005